

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-5-2009

# Michaels v. Equitable Life

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-4256

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Michaels v. Equitable Life" (2009). *2009 Decisions.* Paper 2077.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/2077

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-4256

———

LAWRENCE MICHAELS,
                                    Appellant

v.

THE EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES EMPLOYEES, MANAGERS,
AND AGENTS LONG-TERM DISABILITY PLAN, ET AL.

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civil No. 04-cv-3250)
District Judge: Honorable J. Curtis Joyner

———

Argued on December 1, 2008

Before: AMBRO, WEIS, and VAN ANTWERPEN, *Circuit Judges*.

(Filed: January 5, 2009)

Ronald H. Surkin, Esq. (Argued)
Gallagher, Schoenfeld, Surkin, Chupein & Demis, PC
25 W. Second Street
P.O. Box 900
Media, PA 19063

        *Counsel for Appellant*

Daniel J. Zucker, Esq. (Argued)
Deborah Z. Winfield, Esq.

Law Offices of Daniel J. Zucker
260 South Broad Street, Ste. 1200
Philadelphia, PA 19102

*Counsel for Appellee*s

———

OPINION OF THE COURT

———

VAN ANTWERPEN, *Circuit Judge.*

Appellant-Plaintiff Lawrence Michaels appeals from the District Court's decision

affirming the denial of long-term disability benefits by the Equitable Life Assurance

Society of the United States Employees, Managers, and Agents Long-Term Disability

Plan and AXA Financial, Inc., the Appellees-Defendants. For the following reasons, this

Court will vacate the District Court's decision and remand for further proceedings in

accordance with this opinion.

I. Facts and Procedural History

Appellant Lawrence Michaels sustained a midshaft fracture of his left femur

during a horseback riding accident on July 12, 1997. As a result of this injury, a rod was

implanted into his femur. *App.* at 669, 943. Following this surgery, Michaels began

treatment with Dr. Eric Katz, an orthopedic surgeon, and he has continued this treatment

throughout all periods relevant to this litigation.

At the time of his injury, Michaels was employed at a law firm as a tax attorney,

but the law firm terminated his employment effective December 31, 1998 because he was

1

unable to perform the duties required of him due to his "physical[] impair[ment] and severe[] restrict[ion] with respect to travel for the purpose of business development and servicing of clients." *App.* at 677, 679. In January 1999, following this termination, Michaels accepted a position with the Equitable Life Assurance Society of the United States ("Equitable"),[1] an organization that provided short- and long-term disability insurance to its employees via the Equitable Life Assurance Society of the United States Employees, Managers, and Agents Long-Term Disability Plan ("Plan");[2] Michaels enrolled in the Plan and received a copy of the Summary Plan Description[3] ("SPD").

Aetna US Healthcare ("Aetna") administered Equitable's Plan until December 31,

---

[1] The Equitable Life Assurance Society is now AXA Equitable Life Insurance Company. These organizations are collectively referred to as "Equitable."

[2] The Plan is an employee welfare benefit plan within the meaning of sections 3(1) and 4 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002(1), 1003. The Plan is now known as the Long Term Disability Plan.

[3] Another plan was adopted after the SPD; specifically, Equitable and Aetna adopted a Managed Disability Coverage plan ("MDC") that differed from the SPD in some respects. In particular, the MDC provided that "a certified period of disability will end after 24 months if Aetna determines that the disability is, at any time[,] caused to any extent by a mental condition." *App.* at 210. Although the Managed Disability Plan was scheduled to be effective on January 1, 1995, Michaels claimed that he never received the MDC plan document, and Equitable did not contest that claim. Accordingly, the District Court found that "to the extent that [the SPD] differs from the [Managed Disability Coverage document], we find that the language describing the 24-month provision in the SDP [sic] should govern." *Michaels v. Equitable Life Assurance Society of the United States Employees, Managers, and Agents Long-Term Disability Plan et al.*, No. 04-CV-3250, 2007 WL3024571, at *8 (E.D. Pa. Oct. 15, 2007). Equitable does not contest this finding of the District Court.

2

2003, and MetLife became the Plan administrator on January 1, 2004.[4] The SPD provides

that "[a] period of total disability will end after 24 months of receiving disability benefits

if it is determined that the disability arises from or on account of . . . a mental condition

described in the most current edition of the Diagnostic and Statistical Manual of Mental

Disorders." *App.* at 152. Further, the Plan set forth two different definitions for "total

disability" based on the duration of the claimant's disability period:

- during the first two years of your period of disability, you're unable to report to work and perform all of the material or essential duties *of your own occupation* due to illness or injury; and
- after the first two years of your period of disability, you're unable to engage *in any gainful occupation* for which you are, or may reasonably become, qualified by education, training, or experience, other than work under an approved rehabilitation program.

*Id.* (emphasis added).

On May 25, 1999, Michaels stopped working and filed a claim for total disability

benefits; he has not engaged in any gainful employment since that date. Aetna certified

Michaels for a period of short-term disability beginning in May 1999. While this initial

certification did not state the basis for the grant of benefits, an entry in Aetna's internal

---

[4] The SPD granted the administrator discretionary authority to determine eligibility for benefits and to interpret the Plan's terms. Specifically, it provided that:

> [t]he Plans will be administered—and all benefits authorized—by the Plan Administrator or its agent. The Plan Administrator, or a designated party, has the discretionary authority to determine eligibility for benefits under these Plans. This discretionary authority includes the right to make all determinations about the right of any person to receive benefits under the Plan and to interpret the terms of the Plan.

*App.* at 147.

claims system from May 26, 1999 makes reference to Michaels's implanted femoral rod as well as his major depression. To facilitate its disability assessments, Aetna requested Michaels's existing medical records as well as ongoing "Managed Disability Statements" from Dr. Katz and Dr. Aaron Tessler, Michaels's psychiatrist. Following the receipt of a Managed Disability Statement from Dr. Katz on June 2, 1999, in which he characterized Michaels's return to work as "unknown,"Aetna extended his certification for short-term benefits through July 6, 1999. *Id.* at 247-48, 697. Katz described Michaels's "persistent and increasing" pain in his left hip resulting from the implanted femoral rod and recommended that he limit his "ambulatory and sitting activities." *Id.* at 248, 702. Aetna recertified Michaels's claim for benefits for another thirty-one days beginning on July 22, 1999 based on the clinical information submitted by Dr. Katz.

An entry in Aetna's claims processing system details a July 23, 1999 voicemail from Dr. Tessler, which stated that Michaels suffered from depression, had difficulty concentrating, and exhibited diminished organizational skills. In a Managed Disability Statement received on July 28, 1999, Dr. Tessler added that Michaels's ability to return to work was "unclear." *Id.* at 265, 717. Aetna periodically recertified Michaels and, in November 1999, approved Michaels for long-term disability benefits. Thereafter, Aetna periodically recertified him for continued long-term benefits under the Plan. The letter notifying Michaels of his approval for long-term benefits did not specify the basis for his benefits, but it did provide that he would be ineligible for long-term disability payments

4

after twenty-four months if his disability was "the result of a mental condition." *Id.* at 577-79. Further, it provided that if Michaels was still eligible for long-term disability benefits after May 25, 2001, he would be required to meet the "more stringent 'any occupation' definition of disability." *App.* at 579.  This provision of the SPD, quoted *supra*, provides that the claimant's inability to perform the duties of his own occupation is sufficient to qualify as "totally disabled" in the first twenty-four months of disability, but, after twenty-four months of disability, the claimant must be unable "to engage in any gainful occupation."

Following Aetna's approval of long-term disability benefits for Michaels, Dr. Katz and Dr. Tessler continued to treat him.  Dr. Katz reported Michaels's ongoing "pain and stiffness in the left hip region" that was "aggravated by even short periods of sitting and standing" as well as Michaels's "difficulty in ambulation."  In the course of treatment, Dr. Katz and Michaels repeatedly discussed the possible removal of the femoral rod; this procedure was never completed, apparently because the doctors could not assure Michaels that the surgery would relieve his symptoms. Dr. Tessler reported continued mood instability for Michaels and diagnosed him with Bipolar Disorder in March 2000.

In June 2000, Aetna arranged appointments for Michaels to undergo a psychological examination and an Independent Medical Examination ("IME") with psychologist Dr. Donald Hiebel and psychiatrist Dr. Jerome Schnitt, respectively. Dr. Heibel reported that Michaels was "experiencing a severe Bipolar I Disorder manifested

5

currently by an incapacitating depression" and stated that Michaels was "probably" capable of some work although he was "not able currently to do the kind of job he did before" and was "certainly not able to command anywhere near his previous income." *App.* at 593-95. Dr. Schnitt's IME diagnosed Michaels as bipolar, characterized him as "severely debilitated by his illness," and concluded that "[a]t this time he cannot work at any level, in any capacity." *Id.* at 45456, 596-97.

Based on the reports of Drs. Katz, Tessler, Hiebel, and Schnitt, Aetna continued to recertify Michaels until May 2001. Aetna terminated Michaels's benefits on May 26, 2001, twenty-four months after he began receiving benefits, and informed him via letter shortly thereafter. As permitted by the Plan, on July 16, 2001, Michaels timely appealed Aetna's decision to terminate his benefits, contending that his disability did not "arise from or on account of" a mental condition. *App.* at 612-16. Following this appeal, Dr. Oyebode Taiwo, Aetna's medical consultant, reviewed Michaels's file, which included the reports of Drs. Katz, Tessler, Heibel, and Schnitt, and concluded that "the primary health problem preventing [Michaels] from gainful employment is his psychiatric condition." With respect to Michaels's ability to work, Dr. Taiwo found that, in light of his physical limitations, "he should be physically capable of performing sedentary work." *Id.* at 424-26, 548-51. Accordingly, Aetna denied Michaels's first appeal in November 2001.

Michaels requested a second review of Aetna's termination of his disability

benefits on May 23, 2003; his appeal, which included updated records, was referred to the Equitable Benefits Appeals Committee for a final decision. This Committee sought additional information relating to Michaels's orthopedic problem and requested, inter alia, that Michaels submit to an orthopedic IME. *App.* at 757-58.

In a letter dated November 10, 2003, Dr. Robert Geist reported that he conducted an orthopedic IME of Michaels and found that Michaels's medical prognosis was "poor." Dr. Geist indicated that Michaels was "unlikely to be able to resume his previous work status" and that he "would be eligible, at most, for part-time sedentary work." Dr. Geist also noted that, if Michaels returned to work, he "would require a job that could allow alternate sitting and standing every half hour" and an "environmentally controlled" room. *App.* at 878-81. In Aetna's Employability and Impairment Summary Form, Dr. Geist responded "N/A" to the form's inquiry about the employee's ability to return to work with or without modification. In response to the portion of the form that stated "[n]ot able to return to any gainful work at this time, [m]y prognosis for his/her return to some type of employment is," Dr. Geist wrote "pending removal of femoral rod." *Id.* at 876-77. In a supplemental letter dated February 11, 2004, Dr. Geist reported that "the longest [Michaels] can sit reasonably at one time is 30-60 min[utes], and then the pain from the rod tip becomes severe." *Id.* at 888-89.

In a meeting in April 2004, the Committee concluded that Michaels was disabled due to his "major depression" and, accordingly, that he was no longer eligible for

7

benefits. *App.* at 621. The Committee also determined that Michaels's physical impairments did not render him totally disabled and that he was capable of performing sedentary work. In doing so, the Committee characterized Dr. Geist's IME as indicating that "Michaels is capable of performing a short-term sedentary occupation and . . . such a job would need to provide [him] the opportunity to alternate sitting and standing every half-hour and to be situated in an environmentally controlled room." *Id.* at 622. As a result, the Committee upheld Aetna's denial of benefits based on its finding that Michaels was not physically disabled under the terms of the Plan.

Michaels filed suit in the District Court on July 9, 2004, alleging that Equitable's denial of benefits violated the terms of the Plan and constituted a breach of a fiduciary duty. Both parties agreed that the District Court should decided this matter without a jury on the basis of the administrative record. *App.* at 945. On October 15, 2007, the District Court affirmed Equitable's denial of long-term disability benefits and denied Michaels's claim for relief. *Michaels v. Equitable Life Assurance Society of the United States Employees, Managers, and Agents Long-Term Disability Plan et al.*, No. 04-CV-3250, 2007 WL3024571 (E.D. Pa. Oct. 15, 2007). Michaels filed a notice of appeal of the District Court decision on November 5, 2007.

## II. Jurisdiction

The District Court exercised subject matter jurisdiction over Michaels's claim for recovery of plan benefits provided by ERISA pursuant to 28 U.S.C. § 1331 and 29 U.S.C.

§ 1132(e)-(f). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## III. Analysis

### A. Standard of Review

This Court exercises plenary review of the District Court's decision to affirm Equitable's denial of long-term disability benefits and applies the same standard as the District Court applied. *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 194 (3d Cir. 2002). In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court provided that, based on principles of trust law, the denial of benefits under 29 U.S.C. § 1132(a) is subject to de novo review unless the plan at issue "gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where, as here, the plan grants its administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms, this Court reviews the denial of ERISA benefits under an arbitrary and capricious standard. *Post v. Hartford Ins. Co.*, 501 F.3d 154, 161 (3d Cir. 2007); *Smathers*, 298 F.3d at 194-95; *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (3d Cir. 2000); *see also Firestone Tire*, 489 U.S. at 115 (noting in dictum that where plan vests administrator with discretion, the denial of benefits should be reviewed for an abuse of discretion). Accordingly, the arbitrary and capricious standard of review applies to this appeal. Under this standard, the plan administrator's decision will stand unless "'it is clearly not supported by the evidence in the record or the

9

administrator has failed to comply with the procedures required by the plan.'" *Smathers*, 298 F.3d at 199-200 (quoting *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000)). To determine if a decision is arbitrary and capricious, this Court must consider whether the administrator had a reasonable basis for its decision. *Id.*

Before the District Court, Michaels unsuccessfully argued for application of a heightened version of the arbitrary and capricious standard based on case law from this Court endorsing a heightened version of the standard where a plan administrator who exercises discretionary authority has a conflict of interest. In particular, this precedent provided that where the administrator was operating under a conflict of interest, the court would apply a "sliding scale" to give the administrator's decision less deference as the severity of the conflict of interest rises. *Pinto*, 214 F.3d at 393. The District Court concluded that "the structural and procedural circumstances present [did] not call for a heightened form of arbitrary and capricious review" and cited *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 n.5 (3d Cir. 1993), as finding that a similarly structured plan[5]

---

[5] Aetna administers the Plan and makes initial determinations of eligibility for benefits. Benefits payments are taken from an independent trust funded by the employer, Equitable, and benefits payments are not funded on a case-by-case basis. *Michaels*, 2007 WL3024571, at *6; *App.* at A187-88. In *Abnathya*, this Court examined a plan in which the employer acted as the administrator of an employee benefits plan. Under that plan, the employer regularly paid into a fund that was held by a trustee, and the fund's proceeds could only be used for the benefit of plan members; this Court concluded that any conflict that existed was "not significant enough to require special attention or a more stringent standard of review." *Abnathya*, 2 F.3d at 45 n.5.

did not present a conflict. *App.* at A18.

Since the District Court decision, however, the Supreme Court has provided guidance as to how courts should approach potential conflicts of interest. Addressing a plan that vested discretion in an insurance company with a dual status as administrator and payer of benefits, the Supreme Court concluded that such a plan created the type of conflict of interest that informed the abuse of discretion inquiry, even though that conflict was "less clear" than if the employer funded the plan and evaluated claims. *Metropolitan Life Ins. Co. v. Glenn*, --- U.S. ---, 128 S. Ct. 2343, 2346, 2348-49 (2008); *but see Smathers*, 298 F.3d at 197 ("[W]e have explained that the risk of a conflict of interest is decreased where the administrator and funder of the plan is the employer, rather than an insurance company, because the employer has 'incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits' suggesting that there is at least some counter to the incentive not to pay claims." (quoting *Nazay v. Miller*, 949 F.2d 1323, 1335 (3d Cir. 1991))). Further, the Court observed that a plan administrator's potential conflict of interest should constitute just one factor in evaluating whether there was an abuse of discretion in the decision-making process—it should not trigger a change in the standard of review. *Glenn*, 128 S. Ct. at 2350 ("We do not believe that *Firestone*'s statement implies a change in the *standard* of review, say, from deferential to *de novo* review."); *see also Firestone*, 489 U.S. at 115 (concluding that when an administrator entrusted with discretionary authority is operating under a conflict of interest, that conflict

11

must be "weighed as a 'factor in determining whether there is an abuse of discretion'" (quoting Restatement (Second) of Trusts § 187, cmt. d (1959))). Thus, under *Glenn*, a plan administrator's conflict of interest would not give rise to a heightened version of the arbitrary and capricious standard of review; instead, that conflict would represent one of several factors that informed the inquiry as to whether the administrator abused its discretion. *Glenn*, 128 S. Ct. at 2351 ("We believe that *Firestone* means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."). As a result, Michaels abandoned his argument for application of a heightened version of the arbitrary and capricious standard of review on appeal.

*B. Termination of Benefits After Twenty-Four Months*

Under the Plan, after the first twenty-four-month period of total disability, a claimant is eligible for benefits if he is "unable to engage in any gainful occupation for which [he is], or may reasonably become, qualified by education, training or experience." *App.* at A152. Further, Equitable's SPD provided that "a period of total disability will end after 24 months of receiving disability benefits if it is determined that the disability arises from or on account of . . . a mental condition described in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders." *Id.* Michaels asserts that these provisions mean that if his physical disability precludes him from engaging in any gainful occupation, he should continue to receive disability benefits under the Plan. *Appellant's*

12

*Br.* at 14.

The District Court observed that Michaels "would have only been entitled to recertification of the period of disability if he satisfied the 'any occupation' definition based solely on his *physical* condition." *Michaels*, 2007 WL 3024571, at *11. The District Court's statement could be interpreted several different ways. If it means that a totally disabling physical disability would allow recovery of benefits regardless of a mental disability, then the District Court was correct. If it means that any mental condition renders Michaels ineligible for benefits, regardless of the existence of a totally disabling physical disability, we believe the District Court used the wrong standard.

Equitable interprets the District Court's statement to mean that "Michaels would be entitled to benefits if his disability were due *only* to his physical condition." *Appellees' Br.* at 9. We believe that the standard advocated by Equitable misconstrues the Plan. Under Equitable's interpretation, if Michaels were physically and mentally disabled, and his physical disability alone were sufficient to render him unable to engage in any gainful occupation, he would be barred from receiving benefits because his disability would not be due *only* to his physical condition. By limiting benefits for disability arising from a mental condition, however, the Plan implicitly permits benefits to continue beyond twenty-four months where eligibility arises from something other than a mental condition.

The view that this Plan's limitation on benefits applies if a mental condition exists, notwithstanding the presence of a totally disabling physical condition, is plainly

13

unreasonable and undermined by Equitable's conduct.[6] Equitable's interpretation would lead to the absurd result of rendering Michaels's physical condition completely irrelevant, as the presence of any mental condition would negate the effect of total physical disability. Indeed, at oral argument counsel for Equitable acknowledged that, under its interpretation of the Plan's twenty-four-month limitation, if an accident caused an individual to become a totally disabled quadriplegic, and that individual subsequently developed depression, that individual would be barred from receiving benefits after twenty-four months notwithstanding his total physical disability. Under this view, a physically disabled claimant's subsequent development of a mental condition acts as a penalty; such a result is unreasonable and unduly harsh without a clear statement in the Plan that the presence of any mental condition renders void a claimant's eligibility for benefits. Here, the Plan merely provided that "a period of total disability will end after 24 months of receiving disability benefits if it is determined that the disability arises from or on account of . . . a mental condition described in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders." This language fails to put participants on notice that any mental condition, no matter how slight, bars the recovery

---

[6] As Michaels's brief points out, following Michaels's second appeal of his benefits denial, the Plan requested an orthopedic independent medical examination ("IME"). If Equitable believed, as it now argues, that its Plan limited benefits after twenty-four months where a claimant has any mental condition, there would be no need to order an orthopedic examination. In requesting this examination, the Committee charged with evaluating the appeal sought the examination to "determine if his physical condition is such that he is eligible to receive benefits." *App.* at 778.

14

of benefits after twenty-four months.

The difference in the language of Equitable's SPD and MDP is instructive. While the SPD limits eligibility for benefits to twenty-four months if disability "arises from or on account of" a mental condition, the MDP provides that a period of disability "will end after 24 months if Aetna determines that the disability is, *at any time caused to any extent by a mental condition.*" *App.* at 749-50 (emphasis added). The MDP illustrates the position that Equitable now advocates—after twenty-four months, unless a disability is exclusively physical in nature, the claimant is barred from receiving benefits. The SPD, which applies to Michaels's claim, stops short of requiring such a showing.

We hold that, under the terms of Equitable's Plan, if a claimant were totally disabled, and his physical disability were independently sufficient to render him totally disabled, his eligibility for benefits would not terminate after twenty-four months because the claimant also suffered from a mental condition. If a disabled claimant suffered from both mental and physical conditions, neither of which were independently debilitating under the Plan, and the combined effect of those conditions rendered the claimant totally disabled, the administrator would have discretion to determine the claimant's eligibility for benefits beyond twenty-four months. Thus, for Michaels to receive benefits beyond twenty-four months under Equitable's Plan, he would have to show that, by itself, his physical disability precluded him from engaging in any gainful occupation, regardless of any concurrent mental condition. The record contains facts which could support such a

15

finding, as detailed *infra*.

### C. Ability to Engage in "Any Gainful Occupation"

Michaels alleges that the administrator's finding that he was able to engage in "any gainful occupation" constituted an abuse of discretion. As the District Court noted, Aetna's grant of long-term disability benefits in November 1999 "did not indicate the medical basis for awarding benefits." *Michaels*, 2007 WL 3024571, at *2. The failure to identify the basis for Michaels's eligibility for disability suggests that Michaels may have been able to establish total disability based on either his mental condition or his physical condition. As to Michaels's physical condition, the District Court found that "the determination that Plaintiff could engage in 'any reasonable occupation' . . . is not 'clearly unsupported' in the record," noting that "[b]oth Dr. Geist's and Dr. Taiwo's reports conclude that Plaintiff would be able to engage in at least some sedentary work." *Id.* at *11. In making this finding, the District Court misstated[7] Dr. Geist's conclusion, which indicated that Michaels was "capable of performing, *at most*, short-term sedentary work." *Id.* (emphasis added). Further, the District Court may have ignored other evidence in the record that supports a finding of Michaels's inability to engage in any gainful occupation based on his physical disability. For example, an entry in Aetna's file on

---

[7] Although the District Court pointed out that Dr. Geist's reports did not state that Michaels was "unable to work at all," Dr. Geist's responses to the Employability and Impairment Summary Form did report an inability to return to work without the removal of the femoral rod.

16

Michaels dated September 25, 2000 states that "[b]ased on updated clinical information involving [his] persistent pain in the left hip region and possibility of surgical removal of [the] titanium rod, . . . [Michaels] is unable to perform the essential functions of any job." *App.* at 915.

Two orthopedic specialists, Dr. Katz and Dr. Geist, met with Michaels about his physical condition. Throughout treatment, Dr. Katz observed that Michaels experienced "persistent" and "severe" pain resulting from the "prominence of the internal fixation rod." *App.* at 702-03. Dr. Katz recorded "essentially no improvement" over the course of treatment and regularly indicated that Michaels experienced "difficulty with ambulation and stair-climbing as well as a sensation of 'being off balance.'" *Id.* Dr. Katz further documented Michaels's "difficulty with sitting for long periods of time" and "difficulty with standing for long periods of time." Dr. Katz and Michaels discussed the possible surgical removal of the rod, but Dr. Katz explained that "there are no guarantees with removal of the rod and . . . the symptoms may persist even though the rod is removed." *Id.* As to Michaels's ability to work, Dr. Katz pointed to his diminished capacity to function in his own job but declined to express a definitive opinion as to whether Michaels could engage in any occupation, opting instead to describe Michaels's return to work as "to be determined" or "unknown." *Id.* at 697. Dr. Geist described Michaels's medical diagnosis as "poor" and stated that "[h]e is unlikely to be able to resume his previous work status" and that "[h]e would be eligible, at most, for part-time sedentary work." *Id.* at 880.

17

Further, Dr. Geist wrote "N/A" in response to a form inquiry as to Michaels's ability to return to work with or without modification and responded to the prompt "[n]ot able to return to any gainful work at this time, [m]y prognosis for his/her return to some time of employment is" by writing "pending removal of femoral rod." *Id.* at 876-77.

Thus, of the two doctors who physically examined Michaels, one concluded that his ability to return to work was "unknown." The other characterized Michaels's ability to return to work with or without accommodation as "N/A" and responded to the statement "not able to return to any gainful work at this time" by writing "pending removal of femoral rod." Finally, the second examining doctor stated that "at most" Michaels could work two hours per day in a sedentary position.

When Michaels appealed the denial of his benefits, Aetna and MetLife solicited further information from two medical professionals, Dr. Taiwo and an unidentified Independent Physician Consultant. Although neither of these doctors examined Michaels, the administrator gave determining weight to their conclusions Michaels was not physically disabled.

For example, in making its final eligibility determination, the Committee solicited input from MetLife. MetLife responded that its Independent Physician Consultant "felt that Dr. Geist's restrictions/limitations and opinion that Mr. Michael's [sic] would be eligible, at most, for part-time sedentary work was not consistent with the IME physical examination findings." *App.* at 895-96. MetLife stated that its Independent Physician

18

Consultant, whose identity and qualifications are never disclosed beyond an asserted specialty in Physical Medicine and Rehabilitation, asked Dr. Geist several follow-up questions. In response to its question of why his findings would limit Michaels to part-time work, the Independent Physician Consultant characterized Dr. Geist's response as follows:

> Dr. Geist indicated that the longest Mr. Michaels could sit is 30-60 minutes. This is based on the patient's pain over the posterial left hip due to the prominence of the intermedullary rod. Dr. Geist goes on to say this is unlikely to change unless the rod is removed. He then states there was no assurance that the removal of the rod would relieve the symptoms.
> Our [Independent Physician Consultant] felt that this was contradictory and the pain is subjective.

*App.* at 896. MetLife's Independent Physician Consultant stated that "Mr. Michaels [sic] subjective complaints of pain and the inactivity of his upper extremities seem to be the major factors in preventing him from work" and that "there is a lack of objective clinical evidence to support a total disabling condition." *Id.* at 896. Accordingly, the Independent Physician Consultant opined that Michaels did not qualify for long-term benefits. *Id.* at 896-97.

Administrators of ERISA plans need not afford special deference to the claimant's treating physician,[8] and, in *Black & Decker Disability Plan v. Nord*, the Supreme Court

---

[8] The Supreme Court's decision in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), makes clear that no special deference is owed to the opinions of treating physicians when considering the denial of benefits under ERISA. 538 U.S. at 834. A few years before *Nord*, this Court concluded that an administrator's decision to terminate benefits was not arbitrary and capricious where it was based on the

19

stated that "courts have no warrant to require administrators to accord special weight to the opinions of a claimant's physician" and may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." 538 U.S. 822, 834 (2003). The Supreme Court continued, however, that administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*; *see also Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) ("The Supreme Court nonetheless admonished that '[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.'" (quoting *Nord*, 538 U.S. at 834)).  Thus, the Committee was not obligated to give "special weight" to the assessments of Dr. Katz or Dr. Geist, the Plan's appointed orthopedist; at the same time, it could not "arbitrarily refuse to credit [Michaels's] reliable evidence, including the opinions of . . . treating physician[s]." *Id.*

We must set aside the District Court's decision to affirm Equitable's denial of benefits. The  District Court may have applied the wrong standard, and, in addition, it

---

recommendations of its physicians and health care workers despite the view of the claimant's treating physician that the claimant was totally disabled. *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 127-31 (3d Cir. 2000); *see also Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006) (noting deferential nature of arbitrary and capricious standard); *Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1279-80 (11th Cir. 2005) ("Giving more weight to the opinions of some experts than to the opinions of other experts is an not arbitrary or capricious practice."). Because the language in the Supreme Court's subsequent decision in *Nord* is controlling, we focus on that decision.

20

appears to have discredited substantial evidence that Michaels's physical condition rendered him unable to engage in any gainful occupation when the Court concluded that Equitable's denial of benefits was not clearly unsupported by the facts.

*D. Application of Twenty-Four Month Limitation Where Mental Condition Has Physical Cause*

Michaels further argues that his mental conditions, bipolar disorder and depression, stem solely from his physical condition and that, as a result, the twenty-four month limitation on benefits should not apply because his physical condition served as the precipitating cause of his disability. This Court has never addressed the significance, if any, of the etiology of a mental disorder in determining benefits. The courts of appeals are divided as to whether a disability plan's mental disorder limitation applies where a mental condition has a physical cause. The District Court considered this issue and agreed with those courts that have applied the limitation on benefits when the claimant's physical injury or condition caused his mental condition. *Michaels*, 2007 WL3024571, at *10; *see also Fuller v. J.P. Morgan & Co.*, 423 F.3d 104, 107 (2d Cir. 2005) (considering claimant's argument that her bipolar disorder arises from a physical condition, namely a chemical imbalance, and finding that the question of "whether Fuller's 'disability' 'arises from' a mental disorder" to be "quite distinct from whether the disorder itself arises from a physical cause"); *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir. 1998) (reiterating earlier holding that "depression is a 'mental disorder,' irrespective of its physical causes or symptoms"); *but see Lang v. Long-term Disability Plan of Sponsor*

21

*Applied Remote Tech., Inc.*, 125 F.3d 794, 799 (9th Cir. 1997) (interpreting plan limitation for disability "caused or contributed to" by "mental disorder" and finding that depression resulting from physical disorder did not constitute a mental disorder).

We agree with the District Court that Equitable did not act arbitrarily and capriciously in taking the position that the twenty-four month limitation could apply even if the disabling mental conditions were precipitated by a physical injury. As the Second Circuit observed in *Fuller,* the Plan's focus on whether the "disability" arises from a mental disorder presents a different question than whether the claimant's "disorder" was caused by a physical ailment. *See Fuller*, 423 F.3d at 107. That Michaels's depression and bipolar disorder appear to have been caused, or at least exacerbated,[9] by his physical injury does not change the characterization of these disorders as mental conditions.[10] Accordingly, if a claimant is mentally disabled, the source of that mental condition does not affect the applicability of a plan's limitation on benefits. Nevertheless, to the extent

---

[9] At oral argument, counsel for Michaels asserted that Michaels's did not have any mental condition before his injury-causing accident. This assertion is undermined by the record, which includes references made by Dr. Hiebel to Michaels's preexisting mental problems. *App.* at 427 ("Though bright, creative, and successful for years, it appears that Mr. Michaels manifested signs of emotional problems dating back several years, none of which were incapacitating . . . . His past behavioral patterns indicate that he had cyclothymic tendencies, but he never experienced a full emotional breakdown."); *id.* at 454 ("He describes mood swings through much of his life.").

[10] Indeed, the inclusion of bipolar disorder and depression as mental conditions in the Diagnostic and Statistical Manual of Mental Disorders lends further support. The Plan expressly incorporated "the current edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association" into the determination of whether a disability arises from a "mental condition." *App.* at 152.

22

that the claimant can demonstrate that his physical disability independently precludes him from engaging in any gainful occupation, he may still be eligible for benefits under the Plan.

## IV. Conclusion

We have considered all other arguments made by the parties on appeal and conclude that no further discussion is necessary. For the above reasons, we will vacate the decision of the District Court and remand for further consideration consistent with this Opinion.